IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| SUSANNAH O'BRIEN | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:25-CV-01158 |
| | ) | |
| v. | ) | |
| | ) | |
| RUTHERFORD COUNTY BOARD OF EDUCATION, JAMES SULLIVAN, *in his individual capacity and in his official capacity as Director of Rutherford County Schools*, | ) ) ) ) | Judge Crenshaw |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

COME NOW Defendants Rutherford County Board of Education and James Sullivan, *in his individual capacity and in his official capacity as Director of Rutherford County Schools* (collectively "Defendants") and in response to Plaintiff's Emergency Motion for Temporary Restraining Order[1] ("Motion") would state as follows:

### INTRODUCTION

Plaintiff's Motion seeks a temporary restraining order and preliminary injunctive relief in the form of enjoining the Defendants' alleged continued retaliation against her protected speech through separation of her employment as a school teacher and requiring her immediate reinstatement.

---

[1] This Response is limited only to Plaintiff's Motion for Temporary Restraining Order. Defendants reserve the right to respond to Plaintiff's Motion for Preliminary Injunction at a later date.

Charlie Kirk was a well-recognized figure by thousands of people in Rutherford County. In fact, Charlie Kirk was scheduled to be in Rutherford County at a large conference held by one of the largest churches in Rutherford County on September 19 & 20. The Culture and Christianity Conference being held in Rutherford County had been widely advertised and involved many of Rutherford County's families and students. His visit to Rutherford County was eagerly anticipated by thousands of people. After his assassination, the thousands of people who had planned to see Charlie Kirk speak instead held a tribute service to him. Flags throughout the County were flown at half-staff in honor of Charlie Kirk.

The posts made by the Plaintiff were insensitive to the assassination that occurred. The posts were insensitive to the public murder of a person. The posts were insensitive to the thousands of students and families in Rutherford County Schools who were deeply and emotionally affected by the assassination. The posts expressed no sympathy or empathy for the assassination that had occurred in such a public and visible setting. Regardless of whether someone shared Charlie Kirk's political opinions, it is never appropriate to not condemn the murder of someone. The posts by the Plaintiff were volatile and inciteful in Rutherford County as evidenced by the fact that the same were forwarded to the school system by citizens concerned by the Plaintiff's postings. The posts by the Plaintiff are really more than what they state on their face, the message that the Plaintiff's posts send is to condone the assassination, attempt to justify the assassination, or an attempt to defend the actions of the shooter. None of those are appropriate from anyone, let alone a teacher who serves in a role of instruction and influence over youth.

The conduct of the Plaintiff is simply inexcusable in this context. Teachers do not shed their identity as teachers when they leave the school grounds or post on social media. Teachers have always had special roles in our culture. Their actions outside of the school system still reflect

on the school system and impact the school system's reputation. It is for these reasons, the Tennessee State legislature has statutorily adopted the Teacher Code of Ethics, state laws have provisions governing teachers' conduct, and the Rutherford County school system has adopted policies concerning how teachers should conduct themselves.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 65, the purpose of a temporary restraining order is merely to preserve the relative positions of the parties until the Court can hold a hearing for a preliminary injunction. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). A temporary restraining order is an "extraordinary remedy," *Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710 (E.D. Mich. 2006), and the movant must establish that "the circumstances clearly demand it," *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). When determining whether to issue a temporary restraining order, the Court considers four factors that govern its analysis: (1) whether the movant has shown a strong likelihood of success on the merits of the controversy, (2) whether the movant is likely to suffer irreparable harm without an injunction, (3) whether an injunction would cause substantial harm to others, and (4) whether an injunction would serve the public interest. *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007). The four factors generally should be balanced against one another. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

## LAW AND ARGUMENT

I.  **The Motion for Temporary Restraining Order Should be Denied Because Plaintiff Failed to Exhaust Administrative Remedies.**

Plaintiff's request for a temporary injunction should be denied because she has failed to exhaust the administrative remedies available to her following her termination. The October 1,

2025 termination letter attached hereto as Exhibit "A" expressly notified Plaintiff of her right to a full and complete hearing before an impartial hearing officer to challenge the termination decision. Having declined to pursue that administrative process, Plaintiff cannot now seek extraordinary judicial relief. Because Plaintiff has not exhausted the remedies specifically designed to address her employment dispute, her motion for a temporary injunction is premature and must be denied.

## II. Plaintiff is Unable to Meet the Standard for Issuance of a Temporary Restraining Order.

If the Court determines to proceed to act on the Motion for The Emergency Motion for Temporary Restraining Order, the Defendants, respectfully assert that the Motion should not be granted as the standards for issuance of a temporary restraining order are not met in the situation at hand.

### a. Plaintiff Is Unable To Demonstrate Substantial Likelihood Of Success On The Merits.

It is a well-settled rule that the government, when acting as an employer, may regulate employee speech to a greater extent than it can that of private citizens, including to discipline employees for speech the employer reasonably predicts will be disruptive. *See Waters v. Churchill*, 511 U.S. 661, 671–73 (1994). When balancing a public employee's speech rights against the government's interest in workplace efficiency and public trust, courts must give substantial weight to the employer's prediction that speech will disrupt its operations or damage public perception of the agency. *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 541 (6th Cir. 2020). When assessing the government's interest, courts must consider whether the employee's "statement impairs discipline by superiors or harmony among co-workers," "has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," "impedes the performance of the speaker's duties," "interferes with the regular operation of the

enterprise," or "undermines the mission of the public employer[.]" *Id.* 550 (Murphy, J., concurring) (citing *Rankin v. McPherson*, 483 U.S. 378, 388, 390 (1987)). When balancing these interests, the employer's operations-based rationales for firing an employee must increase as the employee's speech interest increases. *Id.*

In *Bennett v. Metropolitan Government of Nashville*, a police officer was terminated after posting Facebook comments ridiculing protesters following a controversial police shooting and using mocking, racially charged language. *Bennett*, 977 F.3d at 535. Although Bennett argued that his posts addressed matters of public concern—namely police use of force and protest movements—the Sixth Circuit found that Metro's interest in maintaining the public's trust in its police department outweighed Bennett's interest in expressing his personal opinions on social media. *Id.* at 541. The court emphasized the jury's finding that Bennett's comments were "reasonably likely to have a detrimental impact on close working relationships." *Id.* at 540. The Sixth Circuit therefore affirmed summary judgment for the employer, holding that its interest in maintaining an effective workplace with employee harmony that serves the public efficiently outweighed the plaintiff's interest in incidentally using racially offensive language in a Facebook comment. *Id.* at 543.

Similarly, in *Venable v. Metropolitan Government of Nashville*, a police officer was terminated for making inflammatory comments on Facebook about a police shooting in another state, including that he "would have done five" shots instead of four. 430 F. Supp. 3d 350, 354 (M.D. Tenn. 2019). Although the court recognized that Venable's comments touched on a matter of public concern, it held that the First Amendment did not protect his speech because the police department could reasonably predict that the statements would be disruptive to its mission and harm public trust. *Id.* at 358, 363. It emphasized that public employers need not "allow events to

5

unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 362.

The governmental interests recognized in *Venable* and *Bennett* are equally—if not more—pronounced in the educational context. Schools, like law enforcement agencies, depend on public confidence, mutual respect, and a perception of fairness to function effectively. Teachers and administrators occupy positions of trust and serve as representatives of the institution in the eyes of students, parents, and the community. Accordingly, the school's interest in preserving public confidence and maintaining an environment conducive to learning justifies appropriate disciplinary action, even when the speech touches on a matter of public concern.

Tennessee law expressly recognizes that educators occupy a position of public trust requiring adherence to the highest professional standards. The educator's professional standards codified in Tenn. Code Ann. § 49-5-1004 provide that:

> The education profession is vested by the public with a trust and responsibility requiring the highest ideals of professional service. In the belief that the quality of the services of the education profession directly influences the nation and its citizens, the educator shall exert every effort to raise professional standards, to promote a climate that encourages the exercise of professional judgment, to achieve conditions which attract persons worthy of the trust to careers in education, and to assist in preventing the practice of the profession by unqualified persons.

Tenn. Code Ann. § 49-5-1004(a). Further, "[i]n fulfillment of this obligation to the profession, educators shall . . . [c]onduct themselves in a manner that preserves the dignity and integrity of the education profession." Tenn. Code Ann. § 49-5-1004(c)(2).

In line with these ethical requirements, the Board of Education promulgated Board Policy 4.4061, "Employee Use of Social Media and Personal Websites" (attached as Exhibit "B"), which states in relevant part,

> Rutherford County Schools respects the right of employees to use social media, networking sites, personal websites, and blogs, but it is important that an employee's personal use of these sites does not interfere with official duties, violate any district policies, or damage the reputation of the school district, its employees, its students, or their families.
>
> Employees should set appropriate boundaries between personal and public online behavior, understanding that what is private in the digital world often has the potential of becoming public, even without their knowledge or consent. It is recommended that employees carefully review the privacy settings on any social media accounts and exercise good judgment when posting content and information on such sites.

Further, under the Policy, "[e]mployees who have a presence on social networking websites are prohibited from posting data, documents, photographs, or inappropriate information that is likely to create a material and substantial disruption of classroom activity."

These standards reflect the high degree of accountability inherent in the teaching profession and the legitimate governmental interest in protecting students, maintaining discipline, and preserving the integrity and reputation of the educational institution. However, in a school system working to teach students that violence is an inappropriate means to resolve differences, the posts made by Plaintiff are contrary to those interests. The posts of Plaintiff reflected negatively on the school system as the Plaintiff was known to be a teacher in the school system. The posts were callous and attempted to send a message that somehow the assassination was excusable.

Therefore, Defendants' interest in maintaining a school system that efficiently serves the public efficiently outweighs plaintiff's interest her social media posts. Plaintiff is therefore unlikely to succeed on the merits in this action, and her Motion for Temporary Restraining Order should be denied.

### b. Plaintiff Is Unable To Demonstrate That She Would Suffer Irreparable Injury Without The Requested Temporary Restraining Order.

Irreparable harm is an "indispensable" requirement for a preliminary injunction, and in the absence of irreparable harm, injunctive relief cannot be granted. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). Plaintiff has failed to show irreparable harm that will befall her before Defendants have an opportunity to respond to be granted a temporary restraining order. *See* Fed. R. Civ. P. 65(b)(1)(A). An irreparable harm is an extraordinary harm—one that cannot be fully compensated by money damages. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008). If Plaintiff can be properly compensated by monetary damages, she cannot show that she is facing an irreparable harm necessary to receive a temporary restraining order. *Norris v. Stanley*, 558 F. Supp. 3d 556, 560 (W.D. Mich. 2021). To be sure, loss of employment is not considered to be an irreparable injury. *See, e.g., Aluminum Workers Int'l. Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982).

Even if this Court ultimately determines that Plaintiff was wrongfully terminated, she would have an adequate remedy at law in the form of monetary compensation—specifically, the recovery of lost wages and benefits withheld during the period of termination. Those damages are readily ascertainable and not so uncertain or speculative as to justify the issuance of a temporary restraining order. Accordingly, Plaintiff has failed to demonstrate that she will suffer irreparable harm absent a temporary restraining order.

Further, Plaintiff cannot demonstrate that the alleged violation of her rights under the First Amendment constitutes an irreparable injury because she is no longer employed by the Defendants and, as such, is no longer subject to the social media policy at issue and is not otherwise currently subject to any action by the Defendants that would restrict her speech. Without ongoing or

imminent harm, there is no basis to find the type of irreparable injury necessary to justify a temporary restraining order.

### c. The Public Interest Would Not Be Served By Issuance Of A Temporary Restraining Order In This Matter.

"[T]he third and fourth factors that comprise the Court's analysis—*i.e.*, whether a temporary restraining order would cause substantial harm to others and whether it would serve the public interest—"merge when the Government is the opposing party." *Blount Pride, Inc. v. Desmond*, 690 F. Supp. 3d 796, 807 (E.D. Tenn. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Under these two factors, [the] Plaintiff[] must show that a temporary restraining order would not result in substantial harm to others and would serve the public interest." *Id*.

Here, issuing a temporary restraining order could potentially harm the public interest because it could have detrimental impacts on schools, teachers, students, and other third parties. Reinstating an employee who was terminated for posting inflammatory or inappropriate material on social media would undermine the public's confidence in the school's ability to uphold professional and ethical standards. It would also send a message to students, parents, and the community that such conduct is tolerated within the educational system, contrary to the professional expectations codified in Tenn. Code Ann. § 49-5-1004 and reflected in Board Policy 4.4061.

Moreover, as the Sixth Circuit recognized in *Bennett* and *Venable*, public institutions have a compelling interest in preserving public confidence and preventing speech that threatens to disrupt operations or damage their credibility. Those same interests are paramount in the educational context, where maintaining a safe, respectful, and inclusive learning environment is essential to the school's mission. Thus, granting a temporary restraining order in this case would not serve the public interest; rather, it would undermine it by interfering with the school's

9

Case 3:25-cv-01158    Document 17    Filed 10/09/25    Page 9 of 11 PageID #: 147

legitimate efforts to safeguard its students and uphold the trust placed in educators by the community.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court deny Plaintiff's Motion and for other relief to which she may be entitled.

**Respectfully submitted,**

**HUDSON, REED & CHRISTIANSEN, PLLC**

**By: /s/ Jeff Reed**
      **JEFF REED, #15000**
      16 Public Square North
      P.O. Box 884
      Murfreesboro, TN 37133
      (615) 893-5522
      jreed@mborolaw.com

      *Attorney for Defendants*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a true and correct copy of the foregoing document was sent to the following via the District Court's electronic filing system and/or U.S. Mail, postage prepaid, to:

Mark J. Downton
The Law Office of Mark J. Downton
1025 Ashmore Drive
Nashville, TN 37211
lawyerdownton@gmail.com

*Attorney for Plaintiff*

Frank Ross Brazil
Brazilclark, PLLC
760 E Argyle Ave
Nashville, TN 37203
frank@brazilclark.com

*Attorney for Plaintiff*

this 9th day of October, 2025.

                                                  **/s/ Jeff Reed**
                                                  **JEFF REED**